IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

I.W.

   Plaintiff,

v.            No.

CITY OF CLOVIS POLICE DEPARTMENT,
BRENT AGUILAR, and DOUGLAS FORD

   Defendants.

## COMPLAINT FOR THE RECOVERY OF DAMAGES CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS

  Plaintiff brings this complaint for damages caused by the violation of his civil and constitutional rights. Plaintiff files this complaint under the Federal Civil Rights Act, the Constitution of the United States, and the New Mexico Tort Claims Act. In support of this Complaint, Plaintiff alleges the following:

## JURISDICTION AND VENUE

1. Jurisdiction over the subject matter of this action is conferred by 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983 and 1988.

2. Venue is proper as the acts complained of occurred exclusively within Curry County, New Mexico.

## PARTIES

3. Plaintiff IW was a minor child at all material times and individual and resident of Curry County, New Mexico.

4. IW's initials are used to protect his privacy because he was a minor at the times alleged.

5.  Defendant City of Clovis Police Department ("CPD") is a governmental entity within the State of New Mexico and a "person" under 43 U.S.C. § 1983. At all times material to this Complaint, CPD was the employer of the individual defendants.

6.  At all material times, Defendant Brent Aguilar was a police officer for the City of Clovis Police Department.

7.  At all material times, Defendant Aguilar was acting under color of state law and within the scope of his employment.

8.  Defendant Aguilar is sued in his individual capacity only.

9.  At all material times, Defendant Douglas Ford was the Chief of Police for the City of Clovis Police Department.

10. At all material times, Defendant Ford was acting under color of state law and within the scope of his employment.

11. Defendant Ford is sued in his official and individual capacities.

## FACTUAL BACKGROUND

12. On March 30, 2019, a vehicle was left running and unattended in the parking lot of a Dollar Store in Clovis, NM.

13. Someone got into the car and drove out of the parking lot.

14. Police officers, including Defendant Aguilar, were dispatched and eventually found the vehicle parked in a Clovis neighborhood.

15. IW was seen running from the area in which police spotted the vehicle.

16. Officers began a pursuit of IW through the Clovis neighborhood.

17. The following incidents were captured on lapel camera footage.

18. During their pursuit, Defendant Aguilar saw a teenage boy running away from the direction of the vehicle.

19. This teenage boy was IW, a 17-year old child.

20. Defendant Aguilar then retrieved his Police Service Dog ("PSD") Leo from his unit.

21. As he unleashed Leo from his car, Defendant Aguilar told the dog, "Get ready, Leo."

22. Defendant Aguilar then began to chase IW on foot.

23. IW continued running and jumped into a backyard.

24. Defendant Aguilar watched IW jump into the yard.

25. Defendant Aguilar ran to the front gate of the yard and yelled, "Come out here now, I'm going to release my dog."

26. Immediately, IW went towards Defendant Aguilar saying, "Alright, alright, alright."

27. IW was unarmed at all times.

28. Defendant Aguilar told IW to "back up and get on the ground."

29. IW surrendered to Defendant Aguilar to avoid being attacked by PSD Leo.

30. As he was commanded, IW went to Defendant Aguilar and dropped onto his knees and put his hands into the air.

31. Defendant Aguilar then proceeded to force open the gate into the yard.

32. Footage from Officer Antonio Orozco's lapel camera clearly shows IW dropping to the ground on his knees and putting his hands into the air before Defendant Aguilar released PSD Leo into the yard.

33. Defendant Aguilar then released PSD Leo through the gate and commanded him to attack IW.

34. Immediately, PSD Leo attacked IW, biting him on his left wrist and right thigh.

3

35. Defendant Aguilar entered the gate and started yelling "Get on the ground!" to IW.

36. IW was already on the ground when Defendant Aguilar entered the gate, with PSD Leo attacking him.

37. Defendant Aguilar screamed at IW "Stop fighting my dog! Stop fighting my dog! Stop fighting him!"

38. IW was not fighting the dog.

39. IW was screaming out in pain.

40. As PSD Leo attacked, Defendant Aguilar yelled, "Good boy!"

41. Defendant Aguilar congratulated PSD Leo on the vicious bite.

42. Once PSD Leo released IW from his jaws, Defendant Aguilar told IW to turn over on his stomach as responding officers entered the yard to handcuff IW.

43. As other officers arrived, held IW down, and handcuffed him, Defendant Aguilar allowed PSD Leo to attack again.

44. PSD Leo grabbed hold of IW's left wrist and began shaking.

45. The force from Leo's bite fractured IW's wrist.

46. As IW started crying out in pain, Defendant Aguilar yelled, "Bad guy, stop fighting my dog! Stop screaming and I'll let him go! Bad guy, stop fighting my dog!"

47. IW had already been handcuffed and restrained by the other officers at this point.

48. IW was not fighting PSD Leo, nor could he have because he was restrained.

49. It was also impossible for IW to "stop screaming" as commanded in the midst of a vicious dog attack.

50. Eventually, Defendant Aguilar commanded Leo to release IW.

51. Defendant Aguilar had the ability to call his dog off of IW at any point during his interaction with IW.

52. After this incident, IW was taken by ambulance to the emergency room at the Clovis General Hospital where he was given a cast for his wrist fracture and a rabies shot.

## COUNT I: EXCESSIVE FORCE
### (Defendant Brent Aguilar)

53. Plaintiff restates each of the preceding allegations as it fully stated herein.

54. IW has a Fourth Amendment right to be free from unlawful search and seizure.

55. This includes the right to be free from the use of excessive force.

56. When Defendant Aguilar arrived at the yard IW was in, he told IW he would release the dog if he did not come out.

57. Immediately, IW surrendered to Defendant Aguilar.

58. Defendant Aguilar saw IW come out to him with his hands in the air.

59. Defendant Aguilar nevertheless released PSD Leo.

60. Police Service Dogs are trained to "find and bite."

61. Police had already "found" IW when PSD Leo was released.

62. Defendants had no reason to use PSD Leo to find IW.

63. IW was in open view and not hiding when PSD Leo was released.

64. Defendant Aguilar deliberately used PSD Leo to bite IW.

65. IW was unarmed and showed no resistance.

66. Further, Defendant Aguilar had no reason to believe IW was armed or posed any threat to his safety or safety of others

67. As a result, there was no reasonable need for PSD Leo to attack or bite IW.

68. Defendant Aguilar knew it was unreasonable, reckless, and unacceptable for Defendant Aguilar to release PSD Leo under these circumstances.

69. It was especially unacceptable for Defendant Aguilar to deploy PSD Leo on a child.

70. Defendant Aguilar allowed PSD Leo to continue attacking IW for an unnecessary length of time.

71. Defendant Aguilar watched PSD Leo bite, pull, and shake IW's arm as he cried out in pain.

72. As PSD Leo continued to attack IW, Defendant Aguilar commanded "Bad guy stop fighting my dog!"

73. Defendant Aguilar's command, "bad guy stop fighting my dog," encouraged PSD Leo to inflict more physical harm on IW.

74. Defendant Aguilar has followed this practice in the past, using the command "bad guy stop fighting my dog" to agitate PSD Leo to continue vicious attacks on civilians.

75. After IW was handcuffed, Defendant Aguilar allowed PSD Leo to attack IW again.

76. Defendant Aguilar told IW he would only stop PSD Leo's attack if IW stopped screaming.

77. It is impossible to stop screaming when a large dog is violently biting you.

78. Defendant Aguilar knew IW would not be able to stop screaming while he was being attacked.

79. Defendant Aguilar's commands were impossible to follow.

80. There was no justification for Defendant Aguilar to deploy PSD Leo for either attack.

81. Defendant Aguilar had the ability to command PSD Leo to release IW at any point during the two attacks.

82. Defendant Aguilar's use of force was unreasonable and done with the intent to seriously harm IW.

83. As a result of the excessive force used by Defendant Aguilar, IW suffered serious injuries, including physical and emotional injuries, pain and suffering.

## COUNT II: CUSTOM AND POLICY OF VIOLATING CONSTITUTIONAL RIGHTS
## (Defendants City of Clovis Police Department and Douglas Ford)

84. Plaintiff restates each of the preceding allegations as if fully stated herein.

85. Defendant Ford was the Chief of Police at all material times to this complaint.

86. Defendant Ford was the final policy maker, responsible for the hiring, training, and supervision of the Clovis Police Department employees.

87. Defendant Ford's policies therefore become the customs and policies of the City.

88. During his tenure, Defendant Ford practiced a custom and policy of unreasonable and excessive use of force.

89. Defendant Aguilar was trained on the policies and procedures of the Clovis Police Department.

90. Specifically, Defendant Aguilar has been trained on how and when to deploy police PSD Leo.

91. Defendant Aguilar has routinely used unreasonable or excessive force when interacting with members of the community in Clovis.

92. Defendant Ford knew of Defendant Aguilar's propensity for violent and excessive use of PSD Leo.

93. Defendant Ford has allowed and encouraged these uses of force.

94. In August 2014, Defendant Aguilar arrested Jorge Corona during a traffic stop.

95. Mr. Corona was the passenger in the vehicle stopped by Defendant Aguilar.

96. Defendant Aguilar arrested Mr. Corona for failing to show him his ID.

97. Dashcam footage of the incident shows Defendant Aguilar threw him "facedown into the asphalt" while his hands were handcuffed behind his back.

98. According to the Complaint filed by Mr. Corona, this use of force "fractur[ed] Mr. Corona's cheekbone and caus[ed] other injuries."

99. In September 2015, Defendant Aguilar was involved in an on-foot pursuit of a man with a misdemeanor warrant for a probation violation.

100. On this encounter, Defendant Aguilar pursued Mr. Robert Moya with a K-9.

101. According to the complaint filed by Mr. Moya, and based on lapel footage of the incident, Defendant Aguilar told him to come out with his hands up or they would release the dog.

102. Defendant Aguilar apparently also told Mr. Moya that if Leo found him, he would bite him.

103. According to the complaint filed by Mr. Moya, Defendant Aguilar released his police dog, who attacked and seized Mr. Moya "by biting his head and latching tightly onto Plaintiff's upper arm with his jaw."

104. Following this incident, Defendant Aguilar's actions were reviewed by the Clovis Police Department.

105. The Department found Defendant Aguilar's actions were "reasonable and within [CPD's] policy."

106. Between February 2014 and May 2017, Defendant Aguilar deployed Leo at least 9 times, all of which resulted in bites to Clovis citizens.

107.   In October 2018, Defendant Aguilar shot a 22-year old Clovis man four (4) times during an on-foot pursuit, killing him.

108.   Following this incident, Defendant Aguilar was placed on paid administrative leave for just seven days, then returned to duty.

109.   Thirty-six (36) days prior to Defendant Aguilar releasing PSD Leo on IW, Defendant Aguilar deployed PSD Leo on Clovis citizen Dan Lucero in Mr. Lucero's mother's apartment during a welfare check.

110.   Dan was standing in his mother's living room with his shoes in one hand and nothing in the other when he was attacked by PSD Leo.

111.   Defendant Aguilar commanded Leo to attack and allowed him to rip, twist, and tear Dan's calf for approximately 30 seconds while he laid face down on his mother's couch.

112.   Even while Dan was handcuffed, Defendant Aguilar still allowed Leo to continue biting Dan.

113.   Despite Defendant Aguilar's continued and frequent use of excessive force, Defendant Ford has allowed Defendant Aguilar to continue serving CPD.

114.   Excluding this incident, Defendant Aguilar has been sued at least six (6) times for his misconduct as a police officer at the City of Clovis Police Officer, including *Foster v. City of Clovis, et al*., 2:2014-CV-00716; *Corona v. City of Clovis, et al*., 2:2017-CV-00805; *Seibenthauler Lodge v. City of Clovis, et al*., 2:2017-CV-01180; *Moya v. City of Clovis, et al*., 2:2018-CV-00494; *Lucero v. City of Clovis Police Department, et al*., 2:2019-CV-00445; and *Clayton Chavez v. City of Clovis Police Department, et al*., D-905-CV-2019-00723.

115.    Despite knowledge that Defendant Aguilar was the defendant to numerous lawsuits involving his violent use of PSD Leo, Defendant Ford still allowed Defendant Aguilar to serve the CPD.

116.    Upon information and belief, Defendant Aguilar has not faced discipline for his use of force during his time as a police officer.

117.    Defendant Ford recently voiced his support for Aguilar's continued use of excessive force against Dan Lucero in a statement to the Eastern New Mexico News.

118.    Defendant Ford told the paper, "I believe Officer Aguilar does a good job. Officer Aguilar is a good police officer. He's trying, like any of my officers, trying to do the best job he can do and take care of the public."

119.    Defendant Ford has implicitly and explicitly encouraged Defendant Aguilar's use of force time and time again as appropriate, endorsing violent behavior from his K9 officer.

120.    As a result, Defendant Ford has emboldened Defendant Aguilar to continue his practice of excessive force against members of the Clovis community.

121.    In effect, Defendant Ford has embraced Defendant Aguilar's conduct as acceptable practice for officers in the Clovis Police Department.

122.    The policies, customs, decisions, and practices of Defendant Ford have created a climate within CPD where excessive or unreasonable uses of force are accepted, especially amongst the K-9 Unit.

123.    There is a causal connection between Defendant Ford's policies and the violation of IW's constitutional rights.

124.   As a result of these policies, IW has suffered serious physical injuries, psychological damages and emotional harm.

## COUNT III: BATTERY
### (Defendant Brent Aguilar)

125.   Plaintiff restates each of the preceding allegations as if fully stated herein.

126.   When Defendant Aguilar arrived at the yard, he told IW that he was going to release his dog.

127.   Defendant Aguilar knew that if he released Leo, he would bite IW.

128.   Police service dogs are trained to find and bite.

129.   Defendant Aguilar released Leo and commanded him to attack IW.

130.   Defendant Aguilar's decision to release PSD Leo to bite Plaintiff was not lawful.

131.   Immediately, as he was trained, Leo attacked Dan and bit IW's leg then wrist.

132.   This dog attack was a harmful and offensive touching that resulted in serious injury to IW, including a fractured wrist.

133.   After officers handcuffed IW, PSD Leo attacked IW a second time.

134.   Defendant Aguilar told IW he would have PSD Leo let him go only if he stopped screaming.

135.   The above described actions constitute a battery upon Plaintiff within the meaning of Section 41-4-12 of the New Mexico Tort Claims Act.

136.   As a direct and proximate result of this battery, IW suffered serious physical injuries, pain and suffering, and emotional injuries.

## JURY DEMAND

137.   Plaintiffs hereby demand a trial by jury on all counts.

WHEREFORE, Plaintiffs requests judgment as follows:

1. Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including damages for attorney's fees and emotional harm.

2. Punitive damages in an as yet undetermined amount severally against the individually named Defendants.

3. Reasonable costs and attorney's fees incurred in bringing this action.

4. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

COYTE LAW P.C.

_/s/ Alyssa D. Quijano_____
Alyssa D. Quijano
Matthew E. Coyte
*Attorneys for Plaintiff*
3800 Osuna Road NE, Suite 2
Albuquerque, NM 87109
(505) 244-3030
aquijano@coytelaw.com