**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

I.W.,

       Plaintiff,

v.                              No. CV 20-807 CG/SMV

CITY OF CLOVIS
POLICE DEPARTMENT, et al.,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants' *Motion for Summary Judgment Based on Qualified Immunity* (the "Motion"), (Doc. 35), filed March 5, 2021; Plaintiff I.W.'s *Response in Opposition to Defendants City of Clovis Police Department, Brent Aguilar, and Douglas Ford's Motion for Summary Judgment Based on Qualified Immunity* (the "Response"), (Doc. 45), filed April 2, 2021; and *Defendants' Reply in Support of Motion for Summary Judgment Based on Qualified Immunity* (the "Reply"), (Doc. 51), filed April 29, 2021.

In accordance with Federal Rule of Civil Procedure 73(b), all parties have consented to the undersigned to conduct dispositive proceedings and issue a final judgment in this matter. *See* (Doc. 18); 28 U.S.C. § 636(c). Further, the parties did not request a hearing on this Motion. *See generally* (Doc. 35); (Doc. 45); (Doc. 51). The Court, having considered the parties' filings, the record, and the relevant law, finds the Motion shall be **GRANTED IN PART** and **DENIED IN PART**.

## I.    Statements of Facts[1]

This case arises from the pursuit and arrest of Plaintiff I.W. by officers of the Clovis Police Department (the "CPD"). Around 6:30 p.m. on March 30, 2019, CPD officers, including Defendant Officer Brent Aguilar, responded to reports of a stolen vehicle. (Doc. 35 at 4, ¶¶ 1-3); *see also* (Doc. 35-1 at 7). Upon further information, Officer Aguilar drove to the reported location of the vehicle, observed it parked in a residential alley, and relayed that information over police radio. (Doc. 35 at 4, ¶¶ 3-4); *see also* (Doc. 35-1 at 7). Officer Aguilar's police service dog, Leo, was in the backseat of Officer Aguilar's unit at the time. (Doc. 35 at 1).

The parties' versions of the events that followed differ critically. Defendants contend Officer Aguilar observed I.W., who was a minor at the time, approach the passenger side of the vehicle, holding "a silver fixed blade knife with a black handle." (Doc. 35 at 4, ¶ 5). I.W. admits that he had used a knife to disable the stolen vehicle's GPS tracking system, but he denies that he was carrying the knife outside of the vehicle and, more importantly, that Officer Aguilar ever observed such. (Doc. 45 at 3, ¶ 5, and 11, ¶ 39); *see also* (Doc. 35 at ¶ 39). In particular, I.W. alleges Officer Aguilar found the knife inside the stolen vehicle only after the encounter with I.W. had concluded, and then concocted his story about the knife "after the event to justify his actions." (Doc. 45 at 2).

At that point, Officer Aguilar identified himself as a police officer, and I.W. fled

---

[1] The facts as the Court recites them are undisputed by the parties unless otherwise noted, and these facts are recited in a light most favorable to Plaintiff I.W. as the non-moving party. *See* Fed. R. Civ. P. 56; *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 955 (10th Cir. 2005); D.N.M.LR-Civ. 56.1(b) ("All material fact set forth in [the movant's] Memorandum will be deemed undisputed unless specifically controverted.").

from him on foot. (Doc. 35 at 4, ¶¶ 7-8). I.W. ran toward a fence and jumped into the backyard of a residence. (Doc. 35 at 4, ¶¶ 6-9). Officer Aguilar drove to the front of the residence and, once parked, he exited his unit and released Leo from the backseat. (Doc. 35 at 4, ¶¶ 6-9). With Leo leashed, Officer Aguilar went around the residence and came to a gate, which led into the backyard. (Doc. 35 at 6, ¶¶ 18-19). He announced himself again, identified himself as "a K9 handler," and ordered I.W. to exit the backyard. *Id.* at 6, ¶¶ 19-20. He further threatened to release Leo into the backyard if I.W. failed to comply. *Id.* Once at the gate, Officer Aguilar observed I.W. on the other side, running toward Officer Aguilar. (Doc. 35 at 6, ¶ 21). He then ordered I.W. to "stop running[,]" and "gave [I.W.] multiple verbal warnings that he would release Leo if [I.W.] did not surrender." (Doc. 35 at 6-7, ¶¶ 21-22, 27).

The parties dispute the ensuing interaction. Defendants contend I.W. refused to surrender, and instead "attempt[ed] to climb the [gate] above Officer Aguilar." *Id.* at 6, ¶¶ 22-24. I.W. contends he surrendered "once multiple officers were surrounding him," and then complied with their commands to "get on the ground." (Doc. 45 at 8, ¶¶ 24, 27). Defendants further allege that once I.W. came to the gate, Officer Aguilar lost sight of him, and thus was unable to ensure I.W. was unarmed. (Doc. 35 at 6-7 ¶¶ 25, 27). I.W. contends Officer Aguilar was able to see him the entire time, and specifically that Officer Aguilar saw he "was unarmed and non-threatening when he released Leo" into the backyard. *Id.* at 8, ¶¶ 27.

At that point, Officer Aguilar released Leo into the backyard with orders to "apprehend" I.W. *Id.* at 6-7, ¶¶ 25-26, 29. Leo charged at I.W., and bit him on the right thigh. *Id.* at 7, ¶ 29. While I.W. was on the ground, and CPD officers were giving I.W.

orders, Leo additionally bit him in the left wrist and forearm. *Id.* at 7, ¶¶ 31-33.

The parties also dispute the remaining interaction. Defendants allege CPD officers placed a handcuff on one of I.W.'s wrists while he lay on the ground, and then Officer Aguilar pulled Leo off I.W., ending the attack. *Id.* at 7, ¶¶ 33-36. I.W. contends he was not handcuffed while Leo was attacking him, but rather only after he had been lifted to his feet. (Doc. 45 at 9, ¶¶ 33-34). I.W. adds that Officer Aguilar allowed Leo to attack I.W. "for almost 30 seconds, approximately 15 of which were after officers had full physical control of [I.W.]." *Id.* at 10, ¶ 35. Thereafter, CPD officers transported I.W. to a local hospital where he received treatment for his injuries. (Doc. 35 at 8, ¶ 40); (Doc. 45 at 11, ¶ 40).

## II. Procedural History

I.W. commenced this action on August 12, 2020. *See* (Doc. 1). In his Complaint, he raises two claims against Officer Aguilar in his individual capacity: a Fourth Amendment claim for excessive use of force under 42 U.S.C. § 1983 (the "§ 1983 claim"); and a claim for battery, which the Court construes as a battery claim under the New Mexico Tort Claims Act (the "NMCTA claim"). (Doc. 1 at 5-7, 11). He raises a third claim against the City of Clovis (the "City") and Chief of Police Douglas Ford "for custom and practice of violating constitutional rights," which the Court construes as a claim pursuant to *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978) (the "*Monell* claim"). *Id.* at 7-11.

The City of Clovis Police Department, Officer Brent Aguilar, and the Clovis Chief of Police Douglas Ford (collectively "Defendants") now seek summary judgment on the basis of qualified immunity. (Doc. 35). Defendants include in the instant Motion a

rendering of the events at issue under the title "Undisputed Material Facts." *Id.* at 4-8. In relevant part, Defendants contend it is undisputed that: (1) I.W. stole a vehicle and, when approached by Officer Aguilar, fled on foot through a residential neighborhood; (2) Officer Aguilar observed I.W. armed with a knife; (3) I.W. refused to surrender despite Officer Aguilar's warnings that he would release Leo to apprehend I.W.; and (4) Officer Aguilar promptly removed Leo from I.W. once I.W. was restrained. *Id.* Defendants argue, based on these facts, the Court should find Officer Aguilar's decision to use his police canine to apprehend I.W. reasonable, and therefore grant him qualified immunity as a matter of law. *Id.* at 19-20.

### III.     Legal Standard for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could affect the outcome of the lawsuit. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (citation omitted). A dispute over a material fact is "genuine" if the evidence presented could allow a rational jury to find in favor of the non-moving party. *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000) (internal citation omitted). "Genuine factual issues must exist that 'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Harapat v. Vigil*, 676 F. Supp. 2d 1250, 1258-59 (D.N.M. Oct. 13, 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

In considering a summary judgment motion, the court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in his or

her favor. *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007). A party seeking summary judgment bears the initial burden of showing there is no genuine dispute as to any material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). When the movant does not have the burden of persuasion at trial, it can satisfy its burden at the summary judgment stage by identifying a lack of evidence on an essential element of the claim. *Id.* at 671. If the party seeking summary judgment satisfies its burden, the burden then shifts to the non-movant. *Id.*

The non-movant cannot rest on the pleadings but must "designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment." *Sealock v. Colo.*, 218 F.3d 1205, 1209 (10th Cir. 2000) (citation omitted). Specifically, the non-movant must identify facts from which a rational trier of fact could find in the non-movant's favor, utilizing evidence such as affidavits, deposition transcripts, or incorporated exhibits. *Adler*, 144 F.3d at 671. The party cannot rest on ignorance of the facts, speculation, or unsubstantiated conclusory allegations. *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003).

"The mere existence of a scintilla of evidence will not avoid summary judgment." *Harapat*, 676 F. Supp. 2d at 1259 (citing *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993)). If the evidence in favor of the nonmovant "is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." *Id.* (quoting *Anderson*, 477 U.S. at 249). "A fact is 'disputed' in a summary-judgment proceeding only if there is contrary evidence or other sufficient reason to disbelieve it; a simple

denial, much less an assertion of ignorance, does not suffice." *Grynberg v. Total S.A.*, 538 F.3d 1336, 1345 (10th Cir. 2008) (citing FED. R. CIV. P. 56(e)).

## IV.   Analysis

Defendants argue that Officer Aguilar is entitled to qualified immunity on the § 1983 claim and the NMCTA claim, because his actions were reasonable under the circumstances. (Doc. 35 at 19-20). Defendants further argue the *Monell* claim against the City and Chief Ford must fail, because Officer Aguilar's actions were constitutional and in accordance with department policy. *Id.* at 15-18. Defendants contend that even if they can be held liable on all three claims, the Court must dismiss I.W.'s claim for personal injury damages for failure to mitigate his damages. *Id.* at 18-19.

In response, I.W. disputes, among other things, Defendants' four "undisputed material facts" listed above and includes a section of his own "Additional Material Facts." (Doc. 45 at 3-15); *see also supra*, at 5. Instead, I.W. alleges that he was unarmed, that the record shows Officer Aguilar did not genuinely believe otherwise, and that, as such, Officer Aguilar's actions violated clearly established law regarding the use of police canines. *Id.* at 16-22. I.W. further contends Officer Aguilar's actions violated CPD's written policy for the use of force, and CPD "has demonstrated a long-standing practice of allowing officers to engage in unreasonable uses of force outside of their written policy." *Id.* at 24. In their Reply, Defendants maintain that Officer Aguilar's conduct was constitutional. *See generally* (Doc. 51).

### A.  Fourth Amendment Claim Under § 1983

Defendants first contend no issues of material fact remain that prevent the Court from granting Officer Aguilar's qualified immunity defense on I.W.'s § 1983 claim.

Defendants argue I.W. "had a stolen vehicle," was observed "carrying a knife outside of the stolen vehicle, "was fleeing on foot in a residential neighborhood during day-light hours" and ignoring Officer Aguilar's repeated warnings. (Doc. 35 at 14). Defendants contend that these facts, which Defendants allege are undisputed, render Officer Aguilar's decision to deploy Leo to bite I.W. reasonable under the Fourth Amendment. I.W., however, disputes the fact that he was ever observed carrying a knife, and thus that he posed a threat to CPD officers or the public. (Doc. 45 at 17-19). I.W. further contends that his crime was not a violent crime warranting the force used by Officer Aguilar. *Id.*

Under § 1983, state officials sued in their personal capacity for damages may raise the defense of qualified immunity. *A.M. v. Holmes*, 830 F.3d 1123, 1134 (10th Cir. 2016). Once a defendant asserts qualified immunity, the plaintiff bears the burden of demonstrating that both (1) the official violated a federal constitutional or statutory right; and (2) the right violated was clearly established at the time of the official's conduct. *Id.* The Tenth Circuit Court of Appeals has described this test as a "heavy two-part burden," established to protect "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 1134-35 (internal citations and quotations omitted). The plaintiff carries the burden of making this two-part showing. *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).

To state an excessive use of force claim under the Fourth Amendment, the plaintiff must show that a "seizure" occurred, the seizure was "unreasonable," *id.* (quoting *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989)), and that, in the context of a personal-capacity claim, the officer sued caused the unreasonable seizure, *Hafer v.*

*Melo*, 502 U.S. 21, 25, 27 (1991). The reasonableness of the officer's belief as to the appropriate level of force should be judged from the perspective of an officer on the scene, rather than the perfect vision of hindsight. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The calculus of reasonableness must allow for the fact that officers must make split-second judgments in tense, rapidly evolving circumstances. *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009). In making this determination, the court must consider the "totality of the circumstances," including: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight (the "*Graham* factors"). *Graham v. Connor*, 490 U.S. 386, 397 (1989).

Additionally, in defeating a qualified immunity defense, the plaintiff must show that objectively reasonable officers could not have thought the force used was constitutionally permissible—in other words, that the subject officer violated clearly established law. *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007). For a right to be clearly established, there must be a Supreme Court or Tenth Circuit case on-point as to the specific context of the case, not as a broad general proposition, or the clearly established weight of authority from other courts must have determined the law to be as the plaintiff urges. *See Fisher*, 584 F.3d at 900.

In determining whether the plaintiff has established the two prongs outlined above—and the plaintiff is required to establish *both*—the court ordinarily accepts the plaintiff's version of the facts. *See Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). However, because the summary

9

judgment stage is "beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "As with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts.'" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). When the plaintiff proves the existence of a genuine factual dispute involving an issue "on which qualified immunity turns," summary judgment on the basis of qualified immunity is "inappropriate." *Harapat*, 676 F. Supp. 2d at 1266 (citing *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988)).

### i. *Whether Officer Aguilar Violated a Constitutional Right*

The Court will consider each of the *Graham* factors in determining whether Officer Aguilar's use of his police service dog, Leo, to apprehend I.W. was an excessive use of force and, therefore, violated I.W.'s Fourth Amendment right to be free from unreasonable seizures.

### 1. *Severity of the Crime*

When Officer Aguilar commanded Leo to bite I.W., he suspected I.W. of receiving or transferring a stolen vehicle, which is a fourth-degree felony under New Mexico Law. *See* NMSA 1978, § 30-16D-4 (2009). I.W. contends this is not "a violent crime" but rather "a low-level, fourth-degree felony" involving only property. (Doc. 45 at 17). I.W. adds that "the property was recovered before [he] was even apprehended by police." *Id*. Defendants argue that, in Officer Aguilar's experience, "subjects who are found in

possession of a stolen vehicle are more likely to flee law enforcement officers" and "are more brazen when attempting to flee from law enforcement." (Doc. 51 at 8).

The Tenth Circuit recently resolved this issue, establishing what appears to be a bright-line rule. In *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154 (10th Cir. 2021), the Court explained, "[O]ur binding precedent indicates the first *Graham* factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent." *Id.* at 1170 (citing *Estate of Valverde by and through Padilla v. Dodge*, 967 F.3d 1049, 1061 n.2 (10th Cir. 2020) ("[O]ur cases have not considered the nature of a felony in determining that it is a serious offense under the first *Graham* factor") (other citations omitted). As such, the Court must find that the first *Graham* factor favors Officer Aguilar.

### 2. *Degree of the Threat*

The second *Graham* factor concerning the threat to the safety of officers or others "is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Bond v. City of Tahlequah, Oklahoma*, 981 F.3d 808, 820 (10th Cir. 2020). In evaluating this factor, the Court "must look at whether the officers [or others] were in danger at the precise moment that they used force." *Emmett v. Armstrong*, 973 F.3d 1127 (10th Cir. 2020) (alteration in the original) (internal quotation marks omitted).

Officer Aguilar argues he reasonably believed I.W. posed a threat to the safety of officers, the community, and "the residence of the backyard he was in," because Officer Aguilar observed him with a knife when he fled on foot and "did not know whether [I.W.] had disposed of it." (Doc. 51 at 8). Officer Aguilar compares the safety threat here to the

threat posed in *Marquez v. City of Albuquerque*, 399 F.3d 1216 (10th Cir. 2005).

*Marquez*, however, is markedly distinguishable. There, the plaintiff, a passenger in a car

that had engaged in a high-speed chase with officers, attempted to flee on foot after the

vehicle had crashed into a wall. *Id.* at 1219. The Court opined that the high-speed chase

was "extended and reckless," thereby "support[ing the officer's] belief that failing to

apprehend [the plaintiff] would endanger the public safety and allow the suspects to

evade arrest." *Id.* at 1221. Here, the evidence is clear that I.W. never led CPD on a

vehicle pursuit of any kind, nor did he pose a threat of doing so.

That argument aside, this factor largely turns on Officer Aguilar's allegation that

he reasonably believed I.W. may have possessed a knife at the exact moment Officer

Aguilar decided to release Leo into the backyard. *See* (Doc. 35 at 4, ¶ 5). I.W. disputes

this fact. At his deposition, I.W. testified that before he exited the vehicle, he threw a

knife onto the floorboard, which Officer Aguilar later found during a search of the

vehicle. (Doc. 35-3 at 3). I.W. contends Officer Aguilar never saw a knife in his

possession, but rather concocted a post-hoc justification for his use of force when he

found the knife inside the vehicle after the encounter had ended. (Doc. 45 at 2). In the

Court's view, the parties' dispute over this fact is genuine and material such that the

video evidence could be construed to support either version of this fact.

Officer Aguilar's lapel video, which was active from the beginning through the

end of the encounter, does not show at any time a knife in I.W.'s hand or on his person.

*See generally* (Aguilar Lapel Video). The other lapel video submitted by the parties,

belonging to Officer Orosco, captured a clear view of I.W. running across the subject

backyard and toward the gate separating him from Officer Aguilar. *See* (Doc. 45, Ex. 3

("Orosco Lapel Video"). Officer Orosco's lapel video shows no knife in I.W.'s hand or on his person at any time. *Id.*

At no point during the encounter does Officer Aguilar contemporaneously mention I.W.'s possession of a knife either over the radio or across the backyard to the other officers. *See generally* (Aguilar Lapel Video; the Orosco Lapel Video). Officer Aguilar is heard describing over radio I.W.'s location and his clothing, but he never mentions the presence of a knife. *See generally* (Aguilar Lapel Video). He is heard ordering I.W. to "back up," to "come out or [he would] release [his] dog," and to "get on the ground," but he is never heard ordering I.W. to drop a knife or a weapon. *Id.* at 1:30-2:19. Thus, a reasonable jury could, for instance, construe the video evidence to support I.W.'s version of this fact.

While I.W. clearly did not comply with CPD officers' commands initially, a reasonable jury could conclude Officer Aguilar should have realized that I.W. posed no immediate threat of danger that necessitated releasing Leo into the backyard. *See* (Doc. 35-2 at 2) (Officer Aguilar testifying at his deposition that if he had not seen a knife, he would not have deployed Leo); *cf. also Estate of Larsen v. Murr*, 511 F.3d 1255, 1258-60 (10th Cir. 2008) (finding that a suspect over twenty-feet away from officers, even wielding a knife, is not considered an imminent threat).

Viewing these facts in the light most favorable to I.W., as the Court must in performing the two-part qualified immunity analysis, the Court finds that a reasonable jury could conclude that I.W. posed no immediate threat to CPD officers or the public and thus this factor weighs in I.W.'s favor. *See* FED. R. CIV. P. 56; *see also Garrison v. Gambro, Inc.*, 428 F.3d at 955.

13

### 3. *Active Resistance or Attempts to Flee*

The third *Graham* factor considers whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 397. As with the second *Graham* factor, here, courts consider whether the plaintiff was fleeing or actively resisting at the "precise moment" the officer employed the challenged use of force. *See*, *e.g.*, *Emmett*, 973 F.3d at 1136 (concluding "the third *Graham* factor . . . weighs against the use of significant force" because "in the precise moment th[e officer] tased [the plaintiff], [the plaintiff] was no longer fleeing" and "was not actively resisting").

Although it is undisputed that I.W. initially fled from CPD officers, the Tenth Circuit has "consistently concluded that a suspect's initial resistance does not justify the continuation of force once the resistance ceases." *McCoy v. Meyers*, 887 F.3d 1034, 1051 (10th Cir. 2018) (collecting cases). The parties dispute whether I.W. was continuing to flee or resist arrest at the moment he was behind the gate and Officer Aguilar released Leo. *Cf.* (Doc. 35 at 6, ¶¶ 22-24); (Doc. 45 at 8, ¶¶ 24, 27).

In the seconds before Officer Aguilar released Leo into the backyard, his lapel video shows I.W. jogging toward the gate—toward Officer Aguilar. (Aguilar Lapel Video at 1:30-2:19). As I.W. reaches the gate, the view of him becomes obstructed. *Id.* Officer Orosco's lapel video, which captures a clear but distant view of I.W., shows him coming to a stop at the gate. (Orosco Lapel Video at 00:37-00:50). It is unclear, though, whether I.W. begins attempting to climb the gate while Officer Aguilar is trying to open it. *Id.* A reasonable jury could conclude that I.W. had slowed and then come to a stop at the gate, effectively surrendering before Officer Aguilar released Leo into the backyard.

As such, viewing these facts in the light most favorable to I.W., the Court finds

that a reasonable jury could conclude that I.W. was not actively fleeing or resisting

arrest at the time of the incident and thus this factor weighs in I.W.'s favor. *See* FED. R.

CIV. P. 56; *see also Garrison v. Gambro, Inc.*, 428 F.3d at 955.

The Court therefore finds, on balance, two of the three *Graham* factors, including

the most important second factor, weigh against qualified immunity. I.W. had committed

a fourth-degree felony property crime and had evaded CPD officers on foot, but, viewing

the evidence in the light most favorable to I.W., he appeared to have no weapon on his

person at any point during the encounter, and he appeared to be surrendering to

officers the moment before Officer Aguilar released Leo into the backyard. A reasonable

jury could conclude Officer Aguilar had a momentary window of time to recognize I.W.

posed no immediate danger to officers or others and likely was no longer fleeing. Thus,

I.W. has shown sufficient facts to demonstrate a reasonable jury could conclude that

Officer Aguilar's decision to release Leo violated his Fourth Amendment rights.

### ii.   *Whether the Constitutional Right was Clearly Established*

The Court will next address the second prong of the two-part qualified immunity

test: whether the Fourth Amendment right to be free from excessive use of force

involving police canines was clearly established at the time of the incident at issue here.

*See Holmes*, 830 F.3d at 1134. "To be clearly established, ordinarily there must be prior

Supreme Court or Tenth Circuit precedent, or the weight of authority from other circuits,

that would have put an objective officer in [defendant]'s position on notice that he was

violating [plaintiff]'s Fourth Amendment rights." *Emmett*, 973 at 1137 (alterations in

original) (quotations omitted). In making this determination, the court may "not . . .

define clearly established law at a high level of generality." *Vette*, 989 F.3d at 1171

(citing *City of Escondido v. Emmons*, __ U.S. __, 139 S. Ct. 500, 503, 202 L.Ed.2d 455

(2019) (per curiam). This directive "is particularly important in excessive force cases."

*Id.*

 "There need not be a prior case directly on point, so long as there is existing

precedent that places the unconstitutionality of the alleged conduct beyond debate."

*McCowan v. Morales*, 945 F.3d 1276, 1285 (10th Cir. 2019) (internal quotation and

citation omitted); *see also Bond*, 981 F.3d at 824 (noting that, even in excessive force

cases, the court's analysis "is not a scavenger hunt for prior cases with precisely the

same facts, and a prior case need not be exactly parallel to the conduct here for the

officials to have been on notice of the clearly established law") (internal quotation and

citation omitted). "Rather, the salient question is whether the state of the law at the time

of an incident provided a fair warning to the defendants that their alleged conduct was

unconstitutional." *Bond*, 981 F.3d at 824-25 (internal quotation and citation omitted).

 It is clearly established in the Tenth Circuit that officers may not use force against

a suspect who has surrendered or is effectively subdued. *See Weigel v. Broad*, 544

F.3d 1143, 1151-52 (10th Cir. 2008) (holding that where the suspect fled through

oncoming traffic and never ceased to vigorously struggle after being caught, it was

reasonable to pin the suspect to the ground, but unreasonable to keep the suspect

pinned once he was no longer a legitimate flight risk); *Herrera v. Bernalillo Cnty. Bd. od

Cnty. Comm'rs*, 361 F. App'x 924, 929 (10th Cir. 2010) (use of force against detainee

who officers initially believed would flee, but who demonstrated that further flight was

unlikely, was clearly excessive); *Holland v. ex rel. Overdorff v. Harrington*, 268 F.3d

1179, 1193 (10th Cir. 2001) ("Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person.").

While neither the Tenth Circuit nor the United States Supreme Court has directly defined this right in the context of dog-bite cases, the clear weight of authority in other circuits has defined its contours. *See*, *e.g.*, *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) (finding it "clearly established that excessive duration of the [dog] bite and improper encouragement of a continuation of the attack by officers could constitute excessive force that would be a constitutional violation"); *Cooper v. Brown*, 844 F.3d 517, 525 (5th Cir. 2016) (affirming district court's finding of excessive force where police dog "continued biting [the nonresistant suspect] for one to two minutes[,]" officer did not remove the dog until the suspect had rolled onto his stomach and was in handcuffs, and officer had "no reason to believe that [the suspect] posed a threat"); *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 923-24 (11th Cir. 2000) (finding it objectively unreasonable for officers to allow a dog to bite and hold a suspect for two minutes—which it described as "an eternity"—where he was compliant with orders and not resisting arrest); *Arrington v. U.S.*, 473 F.3d 329, 339 (D.C. Cir. 2006) (reversing district court's granting of qualified immunity amidst factual dispute as to whether arrestee was armed and not yet subdued when officers beat him and ordered police dog to bite him).

In fact, several courts in this District have applied this well-established law to excessive force cases involving the use of a police service dog. *See*, *e.g.*, *Sanchez v.*

*Baker*, 457 F.Supp.3d 1143 (D.N.M. 2020); *Lucero as next friend to Lucero v. City of Clovis Police Dep't*, No. 2:19-cv-445 KWR/KRS, 2020 WL 1139164, *6-7 (D.N.M. March 9, 2020). In *Sanchez*, for instance, the Court was presented with a case where the plaintiff led police on a vehicle pursuit after they had suspected him of speeding. *Sanchez*, 457 F.Supp.3d at 1150-52. The plaintiff crashed into a wall, exited the vehicle, and then fled on foot. *Id.* Police officers chased him, ultimately cornered him, and gave him a series of verbal warnings and commands. *Id.* The defendant-officer alleged he feared the plaintiff possessed a weapon because his hand was in his waistband. *Id.* at 1151. As the plaintiff was slowly walking toward the officer, the officer released his police service dog, who bit the plaintiff and locked on for "35 to 37 seconds." *Id.* at 1152.

There, the Court found, first, that genuine, material factual disputes existed, including whether the plaintiff was reaching in his pants at the time. *Id.* at 1154-55. After finding a constitutional violation, the Court further found that the right was clearly established at the time of the incident by the clear weight of authority from other circuits. *Id.* at 1155-57. The Court denied qualified immunity, holding it would be clear to a reasonable police officer that releasing a police dog to bite a suspect "who was detained on the basis of non-violent misdemeanors, who did not pose an immediate safety threat, and who had attempted to evade arrest but who had surrendered and was slowly approaching the officers, would constitute excessive force." *Id.* at 1157.

Here, given the weight of the case law cited above and viewing the evidence in the light most favorable to I.W., a jury could conclude that a reasonable officer in Officer Aguilar's position would have known that releasing Leo into the backyard and allowing the attack to continue for thirty seconds violated the Fourth Amendment. *See* (Aguilar

Lapel Video at 02:18-02:48). First, a reasonable jury could conclude I.W. did not pose a threat at the moment of the incident. I.W. was fleeing on foot, not by vehicle, and, as explained above, a genuine factual dispute exists as to whether Officer Aguilar observed him with a knife. Second, and perhaps most importantly, the parties genuinely dispute whether I.W. had surrendered prior to the attack, and the video evidence does not resolve that dispute. At most, the video evidence shows I.W. slowly jogging toward Officer Aguilar. As such, a reasonable jury also could conclude I.W. had surrendered before Officer Aguilar deployed Leo.

In sum, the Court finds that Officer Aguilar's actions are not entitled to qualified immunity at this stage, because a reasonable jury could conclude that his decision to release Leo violated I.W.'s clearly established right to be free from excessive force under these circumstances.

Further, given the genuine factual discrepancies over whether I.W. was in possession of a knife and whether he had surrendered prior to the dog bite, summary judgment on I.W.'s § 1983 claim against Officer Aguilar is precluded. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) ("In the end, [] the defendant still bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense. When the record shows an unresolved dispute of historical facts relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be properly denied.") (internal quotations and citations omitted).

### B. Battery Claim Under the NMCTA

Next, while Defendants do not explicitly argue that Officer Aguilar is entitled to

summary judgment on I.W.'s state law battery claim for the reasons they argued he was entitled to qualified immunity on the § 1983 claim, they do contend I.W. "cannot collect damages for th[e] injuries" he sustained, because he "failed to mitigate his damages." (Doc. 35 at 18-19). In particular, Defendants contend I.W. "easily could have avoided" the injuries "sustained from his apprehension by Leo" if only he had "simply follow[ed] Officer Aguilar's repeated warnings and stopped his flight from the police." *Id.* at 18.

Defendants indicate that, for purposes only of the failure-to-mitigate argument put forth here, they are conceding that Officer Aguilar could be held liable for the dog bite but that he nevertheless cannot be held liable for the damages. On a closer reading, however, Defendants are not in fact conceding the issue of liability even only for the purposes of this discrete argument. They indicate that I.W. failed to mitigate his damages, in part, because he refused to stop his flight from CPD prior to "his apprehension by Leo." *Id.* As explained above though, the very fact of whether he surrendered prior to the release of Leo is genuinely disputed. Therefore, for the same reasons explained above, summary judgment is improper on this issue and will be denied.

To the extent Defendants are separately contending Officer Aguilar is entitled to summary judgment on the same grounds argued on the § 1983 claim—that his actions were reasonable—summary judgment is inappropriate. In determining whether a police officer is liable for battery for his use of force in facilitating an arrest, courts apply a similar "objective reasonableness test" as that utilized under the Fourth Amendment. *See Alaniz v. Funk*, 364 P.2d 1033, 1035 (N.M. 1961). The Court has concluded that genuine material factual disputes exist over whether I.W. was in possession of a knife

and whether he had surrendered prior to Officer Aguilar's decision to release Leo. The Court concludes the same disputed material facts likewise render summary judgment improper on the reasonableness of Officer Aguilar's conduct for purposes of I.W.'s state law battery claim.

### C. *Monell* Claims Against the City of Clovis and Chief Ford

Finally, Defendants ask the Court to grant summary judgment on I.W.'s *Monell* claims against the City and Chief of Police Douglas Ford because "there is no evidence Officer Aguilar violated City policies." (Doc. 35 at 16). Specifically, Defendants reiterate their argument that Officer Aguilar did not violate I.W.'s constitutional rights, and they further argue that in any event there was no City policy or custom that caused the violation. *Id.* at 17-18. In response, I.W. appears to concede that CPD's written policy governing the use of police service dogs is not unconstitutional but, rather, that "CPD has demonstrated a long-standing [unwritten] practice of allowing officers to engage in unreasonable uses of force outside of their written policy." (Doc. 45 at 24-25). In support, I.W. alleges Officer Aguilar "has a history of using his police dog excessively on non-threatening, unarmed civilians that have resulted in numerous civil suits against him[,]" and I.W. cites one specific incident involving his police service dog and one not involving the dog. *Id.* at 12-14, 24-25.

A municipality cannot be held liable for the unconstitutional conduct of its employees under a theory of *respondeat superior*. *Monell*, 436 U.S. at 690. Instead, a municipality is liable under § 1983 only where the employee's unconstitutional conduct occurred while he was carrying out a policy or custom established by the municipality, and there is a direct causal link between the policy or custom and the injury alleged.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010). "To establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom and the injury alleged." *Chavez v. Cnty. of Bernalillo*, 3 F.Supp.3d 936, 980 (D.N.M. 2014) (citing *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006)).

In the Tenth Circuit, "the municipal policy or custom required to support § 1983 municipal liability must be based on evidence of (1) a formal regulation or policy statement, (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law, (3) the decisions of employees with final policymaking authority, (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval, or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused." *Mondragon v. Gould*, 18-cv-703 WJ/LF, 2020 WL 6270623, *3 (D.N.M. Oct. 26, 2020) (citing *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1189-90 (10th Cir. 2010)).

Here, I.W. appears to focus his *Monell* claim on the second "policy or custom" theory: that the CPD has an informal custom "of allowing officers to engage in unreasonable uses of force outside of their written policy[,]" amounting to a widespread practice that is so permanent and well-settled as to constitute a custom or usage with the force of law. (Doc. 45 at 24). In his *Response* and his Complaint, I.W. cites six

specific cases in which Officer Aguilar was the subject of an excessive use of force suit over his seventeen-year police career, which are as follows: (1) *Lucero v. City of Clovis, et al.*, No. 2:19-cv-445 KWR/KRS; (2) *Moya v. City of Clovis, et al.*, 2:18-cv-494 GBW/KRS; (3) *Corona v. City of Clovis*, 2:17-cv-805 JCH/CG (collectively the "federal cases"); (4) *Foster v. City of Clovis*, D-905-cv-2014-00292; (5) *Lodge v. City of Clovis, et al.*, D-905-cv-2017-00679; and (6) *Chavez v. City of Clovis, et al.*, D-905-cv-2019-00723 (collectively the "state cases"). *See* (Doc. 45 at 12-14, 24-25); (Doc. 1 at 7-11); *see also* (Doc. 51 at 12-13). Only two of these cases involved claims regarding Officer Aguilar's use of his police service dog.

In *Lucero v. City of Clovis, et al.*, which remains pending in this District, Officer Aguilar is alleged to have entered Mr. Lucero's apartment in response to reports that he was suicidal, and thereafter Officer Aguilar deployed Leo to bite him. *See id.*, at *2. The Court denied Officer Aguilar's motion for summary judgment on the basis of qualified immunity, finding that a reasonable jury could conclude he violated Mr. Lucero's Fourth Amendment rights by commanding Leo to bite him. *Id.* at 3-7. This case thus supports I.W.'s contention of a CPD policy permitting, and even encouraging, Officer Aguilar to engage in unreasonable uses of force involving his police service dog.

The problem, however, is that the remaining five cases do not support that contention. *See Ward v. City of Hobbs*, 398 F. Supp. 3d 991, 1041-42 (D.N.M. 2019) ("When there is no formal written policy and the § 1983 plaintiff is relying upon a practice or custom, some courts appear to look for a specific number of prior similar incidents—often saying that two or three instances will not suffice.") (citing *Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court has not adopted any

bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice.")); *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (holding that two instances of misconduct "do not indicate a 'persistent and widespread' pattern of misconduct that amounts to a city custom or policy of overlooking police misconduct"); *Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1304 (5th Cir. 1995) (holding that two incidents of alleged excessive force are insufficient to show policy or custom).

In fact, *Moya v. City of Clovis, et al.*, 2:18-cv-494 GBW/KRS, appears to be the only other civil case even alleging Officer Aguilar used excessive force involving his police service dog. There, Officer Aguilar was alleged to have deployed Leo to bite Mr. Moya, who was wanted for two outstanding warrants, had a history of flight, and was actively fleeing officers at the time. *Moya v. City of Clovis, et al.*, 2:18-cv-494 GBW/KRS, 2019 WL 6255217, *2-4 (D.N.M. Nov. 22, 2019). The Court determined Officer Aguilar did not violate Mr. Moya's Fourth Amendment rights and granted him qualified immunity. *Id.* at 5-8. As such, this case is unhelpful to I.W.'s position, because it evinces no prior instance of excessive use of force.

The other four cases are similarly unhelpful because none of them appear to involve Officer Aguilar's use of his police service dog. *See Ward*, 398 F.Supp.3d at 1039 (With informal customs, policies, or practices "the plaintiff can plead either a pattern of multiple similar instances of misconduct—no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible."). The parties agree that in *Corona v. City of Clovis*, No. 2:17-cv-805 JCH/CG, Officer Aguilar

was sued not for his use of his police service dog but rather was alleged to have used excessive force in throwing Mr. Corona face-down onto asphalt. With regard to the three state cases, I.W. has failed to plead sufficient facts for the Court to fully analyze those cases. Suffice it to say, it appears that in two of those cases Officer Aguilar was not accused of excessive use of force, and in the third case he was not alleged to have used a police service dog. *See* (Doc. 51 at 12-13); (Doc. 1 at 9).[2]

In sum, I.W. has failed to establish that the foregoing cases involving Officer Aguilar are similar enough such that Chief Ford and the City would have had "notice that its action or failure to act [wa]s substantially certain to result in a constitutional violation" as a result of Officer Aguilar's use of a police service dog, and that "it nonetheless consciously or deliberately cho[se] to disregard the risk." *See Murphy v. Bitsoih*, 320 F. Supp. 2d 1174, 1195 (D.N.M. 2004) (quotation omitted). Therefore, I.W. presents no issue of material fact regarding his *Monell* claim, and the Court will grant summary judgment on this claim.

## V.     Conclusion

For the reasons stated above, Defendants are entitled to summary judgment only on Count II (the "Custom and Police of Violating Constitutional Rights" claim) in the Complaint, (Doc. 1), and this claim is accordingly **DISMISSED**. Defendants are not entitled to summary judgment on Count I (the "Excessive Force" claim) or Count III (the "Battery" claim) in the Complaint, and therefore the Motion as to these claims is **DENIED**.

---

[2] I.W. alleges in the Complaint that "[b]etween February 2014 and May 2017," Officer Aguilar "deployed Leo at least 9 times, all of which resulted in bites to Clovis citizens." (Doc. 1 at 8). This allegation alone is insufficient to establish a custom or policy.

**IT IS THEREFORE ORDERED** Defendants' *Motion for Summary Judgment Based on Qualified Immunity*, (Doc. 35), is hereby **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED**.

_____
THE HONORABLE CARMEN E. GARZA
CHIEF UNITED STATES MAGISTRATE JUDGE